The Honorable United States Court of Appeals for the First Circuit is now in session. All persons having any business before this honorable court may give their attendance and they shall be heard. God save the United States of America and this honorable court. Court is in session. Today's cases will be called as previously announced and the times will be as allotted to counsel. The first case today is United States v. Rafael Perez-Rodriguez, appeal number 19-1538. Attorney Bakkeel, please introduce yourself for the record and proceed with your argument. Good morning, may it please the court. This is Linda Bakkeel. I represent Rafael Perez-Rodriguez, the appellant in this matter. Because Mr. Perez's membership in a historically discriminated group was integral to the evidence in this case and there is a reasonable possibility that prejudice might have influenced the jury, this verdict cannot stand. The single relevant question was do you feel that you would not be able to render a fair and impartial verdict based on the evidence and my instructions if the defendant were homosexual or gay. This asked the jurors to identify themselves only if they believed they could not be fair. It did not ask them to identify themselves if they had any prejudice experience or feeling regarding gay people one way or the other. The question therefore did not provide a reasonable assurance that prejudice would be discovered if present. This is the language used most recently in this circuit in Casanova, but also explicitly adopted as the standard in five circuits. Your honors, the most dangerous prejudices are those we do not know we have. A juror in this case may honestly have believed, as the prosecutor suggested, that she could be fair despite the fact that she would not want to work with a gay person. Or a juror may honestly believe that he can obey any instruction that the court might give him while also believing that gay men are predisposed to pedophilia or a threat to the social order. People holding such opinions may believe they are not prejudiced nor unfair, but merely righteous. They may also be overly confident of their ability to follow the court's instructions and they may have served on Mr. Petty's jury. Our counsel, was there any question proposed to the judge? You just mentioned the notion that gay men are predisposed to proposed to the judge that went to that issue. My question was that most of the questions were really just sort of a variation of the question that the judge did ask about whether the involvement of a gay person might mean somebody that could not be fair and impartial. So, was there any question that went specifically to the issue that you just raised about predisposition? No, Your Honor. But there were questions that asked about a juror's being uncomfortable talking about homosexuality, about a juror's relation to gay people in the family or the community. In other words, there were questions that required a jury juror to respond about his or her experience, feelings, and opinions regarding gay people, not just his or her opinion about whether she could be fair. That's the difference between the 10 questions that the defense proposed and the one that was asked. Was the particular distinction you're drawing now between that last question which was asked and other questions which would not have asked the juror to make their own but simply to report a bias? Was that distinction between the questions made to the district court? I don't believe it explicitly was, Your Honor. I don't believe it explicitly was. But at this level, I understand the importance of discretion to the district court, but this was not a question of the judge evaluating how a juror answered a particular question. I guess the concern I'm just wondering is whether in the reality of what happened at trial, the district court might have thought that last question was sort of a catch-all and covered it. And then I'm just wondering whether there was anything that would have apprised the district court that in the view of defense counsel that that's not so the other ones are meaningfully distinct and in particular the one that you're mentioning needed to be asked. Yes, Your Honor. The objection at sidebar after the voir dire, the defense asked for additional questions, proposed some. At some point, the prosecution said, well, maybe yes. And then one was about religious views about homosexuality. Was there anything that was the version that you identified just today that would have been such as, you know, if you had any instances of prejudice towards gay people? Do you have any uncomfortable interactions with them? Was that question stripped of religion specifically identified after the ruling? Yes. No, Your Honor. It was on the record before the ruling. But here's the problem. To serve its function, voir dire must first permit parties to uncover factors that would dictate disqualification. The one question that was asked did not allow the defense to uncover a factor that would indicate disqualification for cause. But even if it had, it clearly did not allow for the intelligent exercise of peremptory challenges. Peremptory challenges are not to be made blindly, but to challenge jurors whom the court thinks have a prejudice but could be fair or have an opinion that could be fair. And the defense feels that he or she should not trust. I don't want to interrupt. My colleagues want to ask further about this, but I do want you to address the sufficiency question. Yes, Your Honor. I will go immediately to that. Your Honor, the district court at sentencing referred to the offense here as a crime of desire involving sex with a minor. This is not a crime of desire. It is a crime of communication. And the district court's view or summary that this is a crime of desire and Mr. Perez did not stop when he was offered an opportunity to do so or to engage, no, to engage in the crime, reveals both the problem with the sufficiency of the evidence and the entrapment instructions. The statutory language here does not prohibit merely causing sex with a minor. It prohibits using the internet to entice or induce or persuade or coerce. The least forceful of those verbs is induce. And the prosecution and at least the 11th the same as cause. Induce is not the same as cause. If the prosecution, if the Congress wanted to prohibit using the internet to cause a minor to engage in sex, it could have said cause a minor. Why do you, I mean, we've made clear there are four separate verbs there, each one with a different meaning, including entice. Entice suggests just creating an opportunity that might be enticing to someone, presenting an opportunity. I mean, this case seems to be more congruent with that notion of enticement rather than to coerce, induce, or even persuade. So you can't just focus on the one verb that seems most favorable to you. No, I thought it was the one least favorable to me because it was the most general. There was enticement here, but it was the defendant who was enticed. He did not offer a single thing to the minor. He did not ask the undercover to communicate with the minor. And that is explicit on the record. He sent no messages. In contrast to all of the other cases, he didn't go looking for a minor. He was not a parent, a guardian, or a person with authority over the minor. The fictitious minor, as presented here, required absolutely no inducement or persuasion. The agent said, don't worry, he's gay, he's happy. I have this puzzlement over the statute and how to think about it in this context, with respect to the intent issue. There may be something that the substantial step requirement in an attempt case answered, but with respect to the intent requirement, in an attempt case, if the defendant is making clear their intention to have sexual relations with a minor child, how is that not manifesting an intention to induce or entice the child to have the sexual relations in the sense of overbearing the will of the child, since the child can't consent? Well, first of all, he's not talking to the child. He's talking to the child. But that's okay, because our cases are clear that you can manifest your intent through conversations with an intermediary. If you ask the intermediary to serve as an intermediary. So, all I'm saying, just sticking with me, the evidence is clear that the defendant in communication with the intermediary manifested an intent to have sexual relations with the child. I differ. He manifested an interest. He manifested an interest. But even when he went to meet the undercover, he said, I want to talk with you about what you want to do. Okay, but if I thought that a juror could find that he manifested an intent to have sexual relations with the child through his conversations with the intermediary, wouldn't that satisfy the intent requirement under the statute? The intent, but not the attempt, because the intent was never communicated. Is that a point about substantial step, then? Yes, Your Honor. So, is that really your argument, that there was no substantial step here? But, Your Honor, I frankly haven't broken it down to intent versus substantial step. I believe the problem here is that this is an offense of communication, and that the defendant, while communicating his interest in sex with a minor, did not communicate any intent to seduce, entice, induce, or persuade the minor. Those verbs all require the intent. The relevant intent is not to have sex with a minor. It is to convince a minor to submit to his will. Counsel, it would be helpful to me in responding to Judge Barron's sufficiency question, and also, frankly, the entrapment issue, and also your arguments about the agency giving improper opinion testimony about what the defendant was thinking. What was the theory of the defense here? I realize there was no defense case. You had cross-examination and closing argument. What was the theory of the defense here? The theory of the defense was that he was entrapped, that he was offered a willing minor, and whenever he hesitated, held back, failed to grab, the agent said, you know, don't worry. Come to my house. I have Xbox. I have all the traditional enticements in enticing minor cases. It came from the agent here. He said, you know, don't worry. If you want this, you can get it. I'll supply a little dinner. We'll have lots of fun. So, it was a case in which the defendant was being enticed by the agent repeatedly. There is no evidence that he had ever done this before, and there was no evidence that he had specifically made up his mind to attempt to induce a minor to submit to his will. He was fascinated. Absolutely. But the communication about his interest stopped with the agent, and as soon as the agent got it, which is what he set out to get after all. That was his job. He kept making sure that the defendant took the step. Counsel, there's some attention paid at trial to the way in which the agent presented himself. I don't know what you call it, the headline, having young fun, something like that. Are you interested in having young fun? There seems to be some uncertainty as to whether the defendant actually saw that and read that, and that could be important because this is a site or an application that is used by men interested in consensual adult sex. What is the state of the record on that issue, whether he knew from the very outset that this was potentially about having young fun or young sex? The state of the record is that the agent said, when asked, he could not tell whether the defendant had seen his profile or not. That is the state of the record. How does the subject of young fun, putting that aside, does he get introduced into the colloquy? Where does that come from initially? Initially, I believe it initially comes from the agent. Did you reserve some time for rebuttal? I did not, Your Honor. I just have one question. You used the phrase, the presentation of a willing minor. Yes. Well, I guess I am just having trouble in this context understanding what that means, given that the child cannot be willing, given the age. Correct, Your Honor, but the statute requires that the defendant... Time has expired. You can go ahead and answer. The exercise makes some intent to influence the will of the minor, even though this statutory offense in Puerto Rico, for example, would make that irrelevant. Judge Barron, Judge Lopez, do either of you have any more questions from Ms. Bakkeel? No. No, thank you. Thank you. Attorney Bakkeel, if you could, at this time, mute your device, and Attorney Maconiatis, if you could unmute your device and reintroduce yourself on the record for court. Yes. Good morning, Your Honors. Julia Maconiatis for the United States. Now, in this case, the district court sufficiently inquired regarding potential bias against homosexuals during the jury selection. The Supreme Court has explained that there's no hard and fast formula regarding or that dictates the depth or the breadth of questions that must be asked. This is something that falls squarely within the district court's province. And here, on appeal, Bettis faces an uphill battle to show that when looking at the voir dire proceedings as discretion. Now, here, the court specifically questioned the panel for homosexual bias, thereby protecting Bettis' right to a fair and impartial jury. When we look at the proceedings as a whole, what we have is the court explains the process of voir dire. He says that the questions are tailored so that Mr. Bettis can receive a fair and impartial jury that will base its verdict on the evidence and the instructions. The court mentioned the charge. It put the panel under oath. It explained that they could answer in public in front of everybody, or if it had questions, it could go to the court on the record with the attorneys and give their questions there. It discussed the charge. When it discussed the charge and how it was about possible child sexual abuse, two jurors had no problem standing up and saying, Your Honor, we can't do this. One did it in front of the whole panel. The second went straight to the judge and explained that his granddaughter had been the victim of sexual abuse. Don't you think there's a difference there in which there's nothing embarrassing in any segment of our society in saying you're against child abuse and you feel strongly about it. But saying that you find homosexuality abhorrent and have strong feelings about that, that puts you into the crossfire socially in society because there are disputes about that in certain areas. So I'm not sure your analogy holds up. Someone would seem to me to be a little bit more reluctant to announce that they have any strong feeling bias against gays. Well, Your Honor, in response to that, the district court did allow an opportunity to speak one on one with the court and the parties. Even on that, that was just the general at the beginning when the proposition was actually made, let's bring the jurors up one at a time. The prosecution opposed it. Well, it's because at that point, nobody had actually said that there was a bias and the court is at a unique point. Do you seriously think out of the 50 jurors there that not a single one of them had a strong bias against homosexuals? Your Honor, nothing in the record supports that. What I'm asking you is just common sense. Do you really think, oh, for 50, it's quite a panel you had there? Well, Your Honor, this court has explained before that voir dire panelists have been forthcoming with their biases. And in the case cited in our brief, United States vs. Society, they collected cases where individuals have been explicit in their bias. And another important factor in determining whether the district... Yes, Your Honor. Did you suggest the distinction that the defense counsel made between a question which asks the juror to make a self-assessment of whether their bias is such that they couldn't sit versus just reporting bias against the group? Well, Your Honor, I believe that the court in through all of its questions did say that because while it did talk about a specific question for homosexual bias, it also... With respect to that issue of homosexual bias, the question as phrased asked the juror to assess whether they had a bias that would preclude them from sitting on the jury and doing a fair job. But the defense counsel was saying that's not the right question because that just asked the juror to make a self-assessment of whether their bias is such that they can sit, whereas what counsel needs to know is whether they have a bias towards the group. And that was not asked. Could you just address that point? Yes, Your Honor. That question was not asked. And it's... Undoubtedly, the court could have asked a myriad of questions. That question, I'm asking about that. Wasn't that question put to the court as one it should ask? Well, the court asked to probe into the religious views of homosexuality. Independent of religious views, was there a question put to the district court where it was asked to just probe into the bias of jurors against the group independent of their assessment of whether the bias was such that they couldn't sit? Well, Your Honor, what happened after the trial? I'm trying to get to your question. Please don't think that I'm editing it. There was a capital question that said, having heard everything that the court said, is there anything else that would preclude you? So it gave the jury another opportunity to reflect. That's the same version. That's about their assessment of whether they could sit. I'm just asking a very simple question. Was the judge asked separately to ask the jury a question that would probe just for whether they had bias against the group and not ask them for an assessment of whether they could sit in light of that bias? Well, what happened was after, at the sidebar, and I have the transcript right here, the defense attorney noted that his additional proposed voir dire included many questions about homosexuality. But when he was saying, you know, I'm wondering whether the court should consider some of those questions, then he focused it to the religious aspect there. So there wasn't sort of this, let's ask about, he said, let's explore it. But when he was giving a specific question for the court to consider asking, he tailored it to the topic of religion. So whether I got, thank you, that's helpful. And just substantively, what's the government's position as to whether there's a justification for not asking about the bias against the group and instead only asking about whether there's a bias that would preclude the juror from sitting? Well, at, when they were discussing it, when the parties were discussing it and the government and the defense and the court, the government did bring up the possibility that circling back could almost be a red flag, could be trying to highlight something where there was an issue. Yeah, I didn't put the question right. I'm just asking the government to use substance. Let's just straight up how to think about what they are in this context. Two questions the defense council proposes for the judge to ask. One is the question that was asked and the other is, could you just probe for whether they have bias towards the group without asking them whether it's a bias of a kind that would preclude them from sitting? Is there a reason not to ask the second question to ask only the first? Your Honor, the second question clearly also would have been a proper exercise of discretion on appeal. Is it error not to ask it? We would argue that it's not an abuse. What is the standard in deciding whether the voir dire was adequate? What is the governing standard in deciding? I understand there's a lot of discretion here, but there is a standard that we apply. What is the standard that we apply in deciding whether the voir dire was adequate? To see whether the district court inquired as to whether there's a potential avenue of bias and that they could render a fair and impartial verdict. Now here, the district court did talk about homosexual bias and then was satisfied with the jury's answer that they could render a fair and impartial verdict. And as an analogy, Your Honor, I know that we've spoken about the Casanova case that was cited in the briefing. Excuse me. The distinction that Judge Barron is drawing. In order for defense counsel to intelligently exercise both for cause challenges and peremptory challenges, why wouldn't it be important to know that despite the juror's self-assessment that I can be fair and impartial, that in fact there have been experiences with about the ability of the juror to be fair and impartial? Well, Your Honor, the question as posed talked about homosexual bias. And then there was given an opportunity for the jury panel, if there was anything, any reluctance they had to then talk about it again. And the court has... Counselor, I'm not sure that's accurate, what you've just said. Point me to any question. Do we know if any one of the 50 jurors had any bias against homosexuals? I don't think that question was ever asked. I think, wasn't it asked, do you have any bias that would keep you from rendering a fair verdict? So as a result, no one knows if... I mean, for all we know, all 50 jurors could have been biased against homosexual, but they made a self-assessment that they could still be fair, even though that assessment is supposed to be made by the court. Your Honor, yes, the question did have two components. It did flag the issue of homosexual bias and then also talked about rendering a fair and impartial verdict. They were dependent, they were dependent components, they weren't independent components. It was almost a two-part question. No, it was not a two-part question. If you have homosexual... No, it was not a two-part question. It was a unified, dependent... I'm sorry, Your Honor, you're... It was a... I'm having a hard time hearing your judgment. Can you hear me better now? I can hear you now. I'm sorry, I didn't mean to interrupt. I just couldn't... No, I appreciate you letting me know. It was a dependent question. In other words, the way the question was framed, could you have answered it truthfully if you had a bias towards homosexuals, but believed on your own that it was not such a bias that you couldn't sit? Let's be specific about what the question was because as Judge Barron says, it's one thing. The question was, do you feel that you would not be able to render a fair and impartial verdict based on the evidence and my instructions if the defendant were homosexual or gay? That was the question, and I think Judge Barron's question is, how does that ask about whether there's any bias? Well, I think it's correct to say that it flagged an issue to the jury that the defendant is gay, and are they capable of rendering a fair and impartial verdict? It didn't specifically use the word bias, but when you take the jury proceedings, the one-year proceedings as a whole, and how the judge described... Let me just ask you this way. If you were truthfully answered no, that you would not have a problem sitting on the jury to that question? I think you could. Right. That means the question did not ask whether you had a bias towards gay people as a group. That's all we're trying to find out. It just was not asked because the question only asked it in terms of, could you sit in light of that bias? Okay. But then the question becomes, Your Honor, what the follow-up questions that were then presented, whether the district court's denial of that becomes an abuse of discretion. And discussing the religion, and when the court did... It did not say that it would not. The court said that it was reluctant to, given its perceptions and the way that the panel had been very open and clear, and it was able to perceive them and see their answers. And religion is not a litmus test for harboring homosexual bias. You've realized what I think what you're saying here is that in a case that involves clearly a homosexual defendant engaging and talking about, homosexual conduct, you're saying it's okay never to ask any of the jurors whether they have any bias against homosexuals. I think that's what you're saying. We should rule. No, Your Honor. I'm not saying that it's okay never to ask. I'm saying that what happened here is not an abuse of discretion because you have to look at the proceedings as a whole. And since there is no Where in the proceedings as a whole is there any attempt to determine whether any of the jurors have a bias against homosexuals? Well, the court clearly flagged the issue, and it explained in the sidebar that it was sensitive to it because when they talked about cultural and religious, and when the defense attorney talked about this, the court said, I was sensitive to that issue. That's why I asked this umbrella question mentioning homosexuality and that the defendant can be gay. Now, at that point, that clearly put the jury on notice that this was going to be an issue, and nobody felt the need to get up and say anything. And their responses and the court's viewing and perception of those responses are entitled to deference. Now, if the court may allow me, in the Casanova case in this case called Hussaini, and I think I'm pronouncing it correctly. And what happened in that case, it was a case that involved two Iranian Americans. And the district court gave a general question on bias, where it said that you're not supposed to use ethnicity, race, religion, in determining whether you can serve, whether you're going to be able to have a fair and impartial verdict. And one woman got up and said, I do not trust Muslims. And she was then dismissed. Then the defense asked for more questions and even individualized questions. And there the district court used its perception, saying that people, when they had problems, they said it. And people said that there was not going to be a problem here. And the Seventh Circuit there said that it was a proper exercise of its discretion and that it was a reasonable choice given what had happened in this case. We submit that a similar circumstance happened here, that the issue of homosexuality, it's not that it wasn't uncovered. The court did bring it to the jury's attention. And then at the end, talked about if there's anything else that would prohibit them from rendering this fair and impartial verdict. Nobody said anything. Given the totality of this record, we believe that the court acted within its discretion. Is it the ultimate logic of what you're saying is that a trial judge could essentially decide voir dire will consist of one question. And that one question will be, I'm going to read a long list of biases and then ask me at the end, would any of you because of those be unable to offer to the races? That seems to be the logic of what you're saying. You simply have to identify the possible bias and ask the juror to make an assessment, not the court or counsel, the juror to make an assessment of whether they could be fair. But your honor, obviously a laundry list of every possible bias that would that would not be the best idea. I'm saying that that's what happened in the Seventh Circuit. And by way of example, and by way of showing that people can get up and a court can use its perception of saying that. But that's not what happened in this case. The avenue of bias of homosexual bias was what the court was sensitive to it and brought it up and whether clearly the court can ask many, many questions. But the question is whether here it abused its discretion when the council asked for more questions. And then they again were limited to the religious aspect of it all. Having seen what the court had seen, using its perception, say it say it stated. Let me just isolate it this way. This is my last question, at least on this topic. I understand what you're saying that there was because of the follow up, the judge wasn't apprised of this distinction. And then it was only apprised of in the context of a request for a question regarding religion. And there are special reasons why it might make sense not to discretion. If I read the record differently, and I thought it was put to the district court to decide on the separate question of whether the question that was asked, which asked for a juror self-assessment was not enough. Is it an abuse of discretion for the judge also then to refuse to ask a question separately about whether there was bias against the group? Just yes or no. And then why you think the answer is yes or no. No, it's put aside your reading of the record in which you say the follow up only concerned religion, which I fully understand the importance of that point. But if I read the record differently, and I thought on this record, the judge was put to the choice of allowing either only the question about juror self-assessment, or also a separate question probing just for whether they had bias against the group. Is it an abuse of discretion only to ask the self-assessment question and not to also ask the question about bias against the group? The short answer is no, your honor, only because the issue, the potential avenue of bias was not theoretical. In the cases cited by the defendant, the court had relied on only general issues of impartiality, fairness. And homosexuality. Judge, I do want to have the government just address the entrapment and sufficiency issues. If we could take the time to do a little bit on that. Go ahead. Yes, your honor, with the court's permission, the government in fact presented sufficient evidence that Bettis attempted to persuade, induce, and entice the minor to engage in sexual activity. As this court has to achieve a minor's mental state. And this can all be done through an intermediary. I think Judge Barron had some questions for you. Yes, yes, your honor. I guess specifically, if you could address the issues that I was probing with your opponent, which is with respect to intent, I'm a little puzzled about how to understand the statute since it doesn't criminalize just an attempt to have sexual contact with a minor. And yet, it seems hard to see how you could intend to have sexual contact with a minor without having the intention that you're going to induce the minor against their will to have sex, given that they're a minor. So that's one. But then secondly, even if the attempt standard is satisfied here, what is your answer on the substantial step point? And in what respect was a substantial step taken here? This seems to me less than we had in the Burke case. But that doesn't necessarily mean it's not enough. So those two points that would be helpful to me. Yes, your honor. In terms of intent, again, the way that this court and many of the sister courts that this court has relied upon, it's the subjective intent. What is it that the defendant wanted to do or illustrate that he was trying to overcome or to get the minor to agree with it? And here, the government presented overwhelming evidence of that. The questions he asked and the things that he wanted to do with this minor shows that it was always his intent to get the minor to agree to do what he wanted to do. He did this through a series of background questions. How did you get such a young boyfriend? How have you been together? Where do you hide him? What do his parents think? How were you able to convince him? How was the first time? How long have you been together? And in no uncertain words, he stated that he wanted to be his boyfriend. So this shows that all along what the minor thought about Mr. Perez was very important to Mr. Perez. And Mr. Perez even asked the agent if he had told the minor about him, which shows that the minor's mental state, he wanted to transform it. He wanted to overcome it and to receive his assent. Now, circling back to the substantial step, Your Honor, I find this case is actually quite similar to the Burke case because in the Burke case, you have a father who is on the internet that wants to get some extra money. You have a defendant who comes up to him and says, well, I want to have sexual illicit conduct with your that the intent was there by having conversations about what you want to do and with a child, but that going and meeting the father was sufficient, a substantial step. Here, we have on that same day, they were planning to do two things. He was going to meet the boyfriend to talk about it so that when he finally met the minor, that the minor would be comfortable. He wanted the minor to be comfortable. He wanted the minor to do scary things, yet wanted it to comfortable. Then, he went to speak with the adult in the hopes of getting a primer about this minor and then meeting him later on. That meeting, just as Burke went and spoke with an undercover pretending to be a father, was a substantial step. Here, we have the substantial step where Mr. Perez went to speak with the boyfriend about what they were going to do and how they were going to do it in order for the minor to be comfortable. Based on that- Judge Barron, do you have any other questions? I'm done. I'm sorry, just very quickly on entrapment, which Judge Barron alluded to. We've made clear that it's a very modest burden of production in order to justify getting an entrapment instruction. There appears to be an ambiguity in the record as to whether when the defendant first made contact with Agent Sieg that he would have understood that it was about having fun with young people. He made an early reference to age eight. What exactly does that mean? I don't understand why that modest burden of production in order to get an entrapment instruction was not met here. This case is somewhat like the Hinkle case in that you have this bundling of illicit and licit sex, a point that we make in Hinkle, where we explain why that entrapment instruction was appropriate. Why isn't this case a lot like Hinkle in that sense? Your Honor, this case is distinguishable from Hinkle, and there was no overreaching here for a couple of reasons. He talks about, my job was to reel him in. He uses that phrase. Once I sensed that there was an interest in young people, my job was then to reel him in. I think he uses exactly that language, doesn't he? But the opportunity, the government presenting a sting operation only provides an opportunity. And when we look at what was actually said, as opposed to how the undercover agent was explaining it to the jury, you'll see that that's exactly what happened. He merely opened the door, and it was the defendant that walked through it. If you look at Exhibit 2A, which is the grinder chats, which shows how all of this sort of unraveled, you have the defendant who says, hi. The agent says, what's up? Do you like younger guys? And then he says, a little later, the younger, the better. I don't discriminate. I started at age eight. The next thing is, my boyfriend is 11. And then he says, yes. So it's not like he was saying, tell me what age you want. Is it 18 or is it 11? Here, there was just this opportunity, this window of young fun. Now, it can be interpreted as maybe a young adult who's 18 years old, or it could be what the agent was going for, a minor. But the whole issue started with, I like younger guys. And the thought of adult sex- In deciding whether the instruction is justified, what view is the judge supposed to take of the evidence just in deciding whether that modest burden of production has been met? If there is some ambiguity on those issues, what does age eight mean? What did he understand when he first contacted the website? Isn't the judge supposed to view that evidence in the light most favorable to the defendant who's trying to invoke the entrapment instruction? Yes, Your Honor. However, we cannot divorce the rest of the conversation because the defense here conveniently talks about the first three steps. But once it's clear that it's an 11-year-old minor, there wasn't any insistence. And there was, I want to play with him. He said that he wanted to have anal sex and oral sex before adult sex even came into the picture. So yes, the agent explained that he needed to put a number. He needed to have the minor's number there. But once that number was there, there wasn't any pressure. It was just the presentation of an opportunity. And this court has held that sting operations that merely provide you with an opportunity with no excessive intimidation, threats, pressure, insistence, none of that is here. It was just, here's this opportunity. The government opened the door and he willingly went through it and then by his own accord explained what he wanted to do. And it was illicit sex with a minor. And then it was the defendant himself who bundled adult sex and then said, well, we can have a threesome. But it was clear beforehand, if you look at 2A, which is the grinder text, that it was just to the minor first that was an 11-year-old minor. And yes, he wanted to play. Yes, the younger, the better, without any sort of prodding or intimidation from the part of the government. Thank you. Mr. Toomey, I'm going to give Ms. Bockill, we've gone over considerably with the government. If Ms. Bockill would like another three minutes to respond, she may have that. Thank you, Judge. Attorney Bockill, if you'd like to reintroduce yourself on the record, please. Yes. Hello again, this is Linda Bockill for Appellant Rafael Perez. I think that I want to The prosecution here kind of ignores the fact that this was a gay dating site and that Mr. Perez Rodriguez went looking for a gay date. And what he found was somebody with a younger boyfriend. And I submit that the exhibits are at least consistent with Mr. Perez consistently having an interest in the older man and the older man saying, I'll bring along my boyfriend, we can have a lot of fun. And if Mr. Perez's interest is in cultivating this guy who seems pretty wild and pretty exciting, he's free to chat about all kinds of things on the internet. But the evidence does not show that he committed to sex with the minor. Now, this was a classic case of bundling illicit and illicit sex. And I submit that the chats read in their entirety, certainly support a view that it was the agent who is enticing the defendant every step of the way, and certainly met the low threshold for an entrapment instruction. I think there is a very important distinction between this case and Burke. In Burke, it was the defendant who reached out to a dad looking for somebody looking for chores to do. An economically desperate man. And the defendant says, hey, I want to, I want to pay you to use your daughter. And the defendant didn't even know, the real parent didn't even know what he meant. In Burke, it was clear what the defendant's intent was. And it was clear from the phone call, he didn't need to go to meet the agent. Here, I submit that if you require the defendant to have an intent to entice the minor, you cannot conclude beyond a reasonable doubt that he had that at the point he went to meet the agent. And he doesn't say, I want to know what to do so that the boy is comfortable. He says, when he's going to meet the agent, I want to know what you want to do. He's still not committed to actually meeting the minor. You have to remember that this is an internet chat. This is a site where people get excited. I had just one last question on the, how to think about entrapment in this context and what needs to be shown. When the offense is going to be the attempt variant. And when the elements of the attempt variant are both the intent of the defendant and the fact that the defendant would then take a substantial step. That would suggest to me that the predisposition that would defeat the ability to get the entrapment instruction has to be a predisposition, not only to intend to have sex with the minor, but a predisposition to take a substantial step in that direction. And I guess on this record, you just addressed them. It's obviously a question that's somewhat favorable to you the way I posed it. That is the point, Your Honor. The substantial step and the intent kind of confirm each other. I submit that his intent was not clear and that the step that he took to meet the agent was in order to make up his mind. And if he made up his mind at that point. So just on that point, I guess on the entrapment issue, I guess what's somewhat concerning to me is what is in the record that would suggest he had a predisposition to do something in that regard beyond just the conversations that occurred, which themselves are somewhat ambiguous on that score. So even if they are enough to support the conviction, I guess there is the question of whether they're to defeat the entrapment instruction. The defendant is consistently asking all these questions about what was it like and how did you do it and all of this, because he doesn't know. There is no predisposition. Somebody who is already involved in these activities would not be asking those stupid questions. Of course, Agent C very helpfully said, I think we've established his predisposition to commit the crime. Obviously that's not a, I guess that's a somewhat facetious observation, but we did not get into that, but he does say that at one point, does he not? I think we've established his predisposition to commit the crime. He does, Your Honor. And that was raised as one of the evidentiary issues, which we did not reach, but it is clearly devastating and improper. I mean, you had to make choices for your oral argument, but you spent a lot of time on those issues in your brief, the improper lay opinion testimony. I gather you continue to urge those as errors that would justify a new trial. Certainly do, Your Honor. And if there were no problem with the voir dire, and if the evidence were clearly sufficient, those issues would be far less important. But the agent's testimony that there was predisposition is fatal, given this record. And so I do rest on the record for my other arguments. Thank you, Ms. Bacchial. Dan, we seem to have lost the video on Judge Barron. I've turned it off, Bill, because it was interfering with my audio. Okay. Thank you. This concludes the argument in this case. Attorney Bacchial and Attorney McIgnatis, you should disconnect from the hearing at this time.